Richard J. HOMAR, Plaintiff,

v.

James E. GILBERT, Individually and in his capacity as President of East Stroudsburg University, Gerald Levanowitz, Individually and in his capacity as Director of Human Resources of East Stroudsburg University, David Marazas, Individually and in his capacity as Police Chief of East Stroudsburg University, Curtis English, Individually and in his capacity as Vice President of East Stroudsburg University, Defendants.

No. 3:CV–93–852.

United States District Court, M.D. Pennsylvania.

Sept. 3, 1999.

James V. Fareri, Maria M. Chesterton, Stroudsburg, PA, for plaintiff.

Gwendalyn T. Mosley, Office of Attorney General, Harrisburg, PA, for defendant.

## MEMORANDUM

VANASKIE, Chief Judge.

On June 7, 1993, plaintiff Richard Homar (Homar) filed this civil rights action under 42 U.S.C. § 1983 against defendants, all of whom are officials of East Stroudsburg University (ESU), asserting that his procedural and substantive due process rights were violated when defendants suspended him from his position as a campus security officer without pay without providing him a pre-suspension hearing after the defendants discovered that Homar had been arrested and charged with a drug felony. (Dkt. Entry 1.) He also contends that his procedural and substantive due process rights were violated when defendants demoted him to the position of groundskeeper. By a Memorandum and Order dated March 17, 1995, I granted defendants' motion for summary judgment, finding that (1) Homar was not entitled to a pre-suspension hearing; (2) Homar was provided an adequate hearing before being demoted to the position of groundskeeper; (3) Homar had failed to establish a "liberty" interest violation in connection with the demotion; and (4) Homar had failed to establish a violation of his substantive due process rights in connection with the suspension and demotion. (Dkt. Entry 34.) On July 18, 1995, the Third Circuit reversed my determination that Homar's procedural due process rights had not been violated, concluding, *inter alia,* that "Homar was entitled to notice and at least some kind of hearing prior to being suspended without pay." *Homar v. Gilbert,* 89 F.3d 1009, 1018 (3d Cir.1996).[1] The Third Circuit also determined that a material question of fact existed as to whether Homar's suspension and/or demotion abridged substantive due process, but remanded the matter to determine whether Homar's position as a campus security officer warranted substantive due process protection. *Id.* at 1021. On June 9, 1997, the United States Supreme Court reversed, in part, the Third Circuit's determination, concluding that Homar's procedural due process rights were not violated when he was suspended without pay without being provided with a pre-suspension hearing. *Gilbert v. Homar,* 520 U.S. 924, 932, 117 S.Ct. 1807, 138 L.Ed.2d 120 (1997). The United States Supreme Court, however, noted that the question of whether Homar was provided with "an adequately prompt post-suspension hearing" had not been addressed by the Third Circuit or by my March 17, 1995 Memorandum and Order. *Id.* at 935.

On remand to the Third Circuit, the parties were directed to "submit briefs addressing the question whether the defendants violated Homar's procedural due process rights by failing to provide a sufficiently prompt post-deprivation hearing, as well as the question whether Homar had properly raised this argument in his original appellate briefing." *Homar v. Gilbert,* 149 F.3d 1164, slip op. at 3, 1998 WL 166850 (3d Cir. Mar. 9, 1998). Although Homar conceded that he had not raised the timeliness of the post-suspension hearing when this case was initially before the appellate court, the panel did not decide the question of whether the issue had been waived. Instead, because the case had to be remanded for consideration of Homar's

---

1. In this regard, the Third Circuit stated: "Although we conclude that these circumstances warranted and justified an immediate suspension of employment without a hearing, the added suspension of pay necessitated a hearing." *Id.* at 1011.

substantive due process claim, the Third Circuit directed that this Court decide in the first instance whether it was appropriate to entertain Homar's arguments concerning the timeliness of the post-suspension hearing. If so, the merits of that issue was to be addressed.

After this matter was remanded, a telephonic conference was conducted on April 23, 1998. The parties were directed to file briefs regarding the following issues:

a. Whether [Homar] had pled in this Court a claim of denial of procedural due process with respect to the timing and/or adequacy of post-suspension proceedings;

b. Whether defendants failed to accord plaintiff timely and/or adequate post-suspension process; and

c. Whether plaintiff's position as a campus security officer qualifies as a "property interest" for purposes of substantive due process protection.

(Dkt. Entry 53.)

## I. BACKGROUND[2]

Homar was arrested by state police in a drug raid at the apartment of James Compton in Monroe County, Pennsylvania, on the morning of August 26, 1992. A local newspaper reported the state police's drug arrests, in pertinent part, as follows:

> Police said Joseph Habhab of Tannersville and his family were at the core of the high-level distribution ring, which obtained 50 to 100 pounds of marijuana every few weeks from Mexico through Texas.
>
> \*    \*    \*    \*    \*    \*
>
> State police Sgt. Richard Morris said investigators found *much of the marijuana was sold in the areas of East Stroudsburg University* . . . .

(Dkt. Entry 28, Ex. 12 (emphasis added).)

In the early afternoon of August 26, the state police called defendant David Mara-

---

**2.** The factual background of this matter has been set forth in the Court's March 17, 1995 Memorandum and Order. (Dkt. Entry 34.)

zas, ESU's Police Chief, to inform him of Homar's arrest and the charges against him. Those charges included possession of marijuana, possession with intent to deliver, and criminal conspiracy to violate the controlled substance law, which is a felony.

By mid-afternoon Marazas brought the information to the attention of defendant Gerald Levanowitz, ESU's Director of Human Resources, who was the ESU official to whom defendant James E. Gilbert, President of ESU, had delegated authority to discipline and suspend ESU employees. After meeting with Marazas, Levanowitz decided to suspend Homar immediately, without pay. (*See* Marazas Aug. 26 notes (Dkt. Entry 28) Ex. 13.) Levanowitz did not conduct a pre-suspension hearing or provide Homar an opportunity to argue against his suspension. Levanowitz, however, did issue a suspension letter. (Dkt. Entry 25, Ex. 1.)

Because Homar worked the second shift at ESU, he was to report for duty at 4:00 p.m. on August 26. He did not report to work that day.

The day after his arrest, on August 27, 1992, Homar called to tell Marazas that he had been arrested and to ask if he was suspended. (*See* Marazas Aug. 26 notes (Dkt. Entry 28) Ex. 13.) Marazas informed Homar that he was suspended and told Homar that he would deliver Levanowitz's suspension letter to him later that day. (*Id.*) The letter advised of the suspension pending further investigation and disposition of the criminal charges, but explained that ESU's ultimate decision in the matter would not necessarily coincide with disposition of the criminal charges.

On the same day (August 27), a Pennsylvania state trooper prepared a supplemental report describing his interview with Homar the previous day at 2:00 p.m. The supplemental report stated:

> For the sake of clarity and convenience, however, it will be repeated here.

HOMAR related that he started to hang around COMPTON around January of 1992. Joseph HABHAB would come to COMPTON'S residence and that is how he (HOMAR) knows HABHAB. HOMAR knew that COMPTON and HABHAB were dealing in marijuana. HOMAR related that originally he knew that HABHAB and COMPTON were dealing in small amounts but since about January of 1992 he knew that they were dealing in large amounts of marijuana and that they were bringing the marijuana in from Texas. HOMAR further related that HABHAB had given him marijuana joints in the past for his personal use.

(Dkt. Entry 25, Ex. 3.) The report indicated that Homar "signed a waiver of his rights form."

During his deposition, Homar denied saying the substance of the statements attributed to him in the supplemental report. Homar explained:

I feel they—Larry Gerrard, the officer that was with me, was trying to confuse me at the time to make these statements—something like this. This isn't what I said myself, he was trying to persuade me.

(Homar Dep. (Dkt. Entry 25) at 29.)

Homar addressed some of this confusion by explaining, for instance, that he did not have knowledge that marijuana was being imported from Texas: "I only stated that I knew ... that his brother ... lived in Texas and that he went to visit him." (*Id.* at 29.) Homar also contested that he stated that Habhab had given him marijuana joints for personal use. (*Id.*) Regarding his relationship with Compton, Homar explained that, as opposed to the supplemental report's version that Homar knew Compton since 1992, he actually knew Compton "before high school and I was involved in high school athletics with him and things like that." (*Id.* at 27.)

Homar explained that on the morning of his arrest he visited Compton's apartment, which is located close to Homar's mother. (*Id.* at 17.) Homar stated:

I went into his house, his apartment was unlit and I came down to the living room area of his house. I focused my attention on the TV. Jim was sitting on the couch at the time and I was telling him how I was ready to get going; I was in work clothes to do yard work and I just was in a hurry to get that over with. And I went to turn to his kitchen area to get a glass of water. I heard two men come down the hallway in plain, dark clothes and I was pushed to the ground.

(*Id.* at 17–18.)

On September 1, 1992, a Pennsylvania state court dismissed the charges against Homar. Levanowitz learned of the dismissal the next day, but continued his own investigation. On September 11, 1992, Levanowitz met with the state police to inquire about Homar's arrest. The state police provided a copy of the supplemental report to Levanowitz and related a far different story of the circumstances surrounding Homar's arrest than maintained by Homar. Levanowitz's notes state:

Trooper George said that when he entered the Compton residence on August 26, 1992, Mr. Homar was seated on a sofa in the living room of the house. When Trooper George yelled State Police and entered the house, Mr. Homar got up and moved quickly toward the kitchen of the residence. Troopers [sic] George saw a metallic object flashing/flying from Mr. Homar's direction which he thought might be a gun. Then he drew his weapon. Trooper George related that the metallic object later turned out to be a metal plate used for processing and cutting marijuana. Trooper George and Raab told me that there were four marijuana "joints" on a coffee table where Mr. Homar had been sitting and one of the joints was half burned and there was a heavy odor of marijuana smoke in the house. They told me that a search of the premises

turned up a triple beam scale, five pounds of marijuana and paraphernalia. (Dkt. Entry 28, Ex. 1, at 1.)

On September 15, 1992, Levanowitz called Homar to schedule a meeting for September 18. Levanowitz told Homar that a union representative would be permitted to attend the meeting with him, but that since, in Levanowitz's opinion, the meeting would be an administrative hearing, Homar did not have a right to have an attorney attend. (Levanowitz Dep. (Dkt. Entry 26) at 42.)

Homar and his union representative, Richard Connell, attended the September 18th meeting with Levanowitz. Connell requested that Homar's attorney be present, and Levanowitz responded that the meeting would have to be postponed because an attorney for ESU also would have to be present. (*Id.* at 52.) The meeting then proceeded without Homar's attorney attending. Homar did not have a copy of the State Police "supplemental report" as of the date of the meeting.

Levanowitz maintains that during the meeting he represented that he "had already done [his] investigation, with the rest of the investigation including talking to the State Police." (*Id.* at 48.) Levanowitz also asserts that he represented during the meeting "that the State Police had given me some evidence very serious in nature." (*Id.*) Homar acknowledged that Levanowitz requested Homar's "side of the story [as] to what happened on August 26, 1992." (Pl's Response to Def's SMF (Dkt. Entry 22) ¶ 24.) However, Levanowitz did not divulge the substance of the supplemental report during the meeting. Consequently, Homar was not able to respond to Trooper George's account.

Levanowitz issued a letter to Homar dated September 23, 1992, in which Leva-

nowitz demoted Homar to groundskeeper. The letter, in part, stated:

> This is to inform you that you are to be demoted from your position as a Police Officer I in the Campus Police Department to the position of Groundskeeper.... This action is effective retroactive to August 26, 1992, and you are to be given back pay to that date at the rate of pay for a Groundskeeper. You are to report to work at 7:00 A.M. on September 24, 1992 at the Facilities Management Office....
>
> *This action is being taken as a result of admissions made by yourself to the Pennsylvania State Police on August 26, 1992 that you maintained associations with individuals whom you knew were dealing in large quantities of marijuana and that you obtained marijuana from one of those individuals for your own use.* Your actions constitute a clear and flagrant violation of Sections 200 and 200.2 of the East Stroudsburg University Police Department Manual.

(Dkt. Entry 25, Ex. 2 (emphasis in original).) [3]

Before Homar's demotion was to take effect, Homar's union representatives contacted President Gilbert, who had final authority with regard to Homar's status as an ESU employee, to request a meeting to discuss Levanowitz's disciplinary action. They requested the meeting "because we felt that maybe Mr. Levanowitz was only giving his side of the story and not giving a fair—he wasn't giving me a fair shake on his conversations with Dr. Gilbert." (Homar Dep. (Dkt. Entry 25) at 45.) Gilbert arranged a meeting at 2:00 p.m. on September 24th.

Although Levanowitz had not provided Homar with a copy of the supplemental report during their September 18th meeting, Homar was in possession of the sup-

---

**3.** Although in the letter Levanowitz provided Homar with back pay for the suspension period at the rate paid to a groundskeeper, he later provided Homar with a retroactive payment of the difference between the grounds-keeper salary and the police officer salary for the suspension period. (Def's SMF (Dkt. Entry 19) ¶ 51; Homar Dep. (Dkt. Entry 25) at 24–25.)

plemental report by the time the meeting with Gilbert occurred. (Homar Dep. (Dkt. Entry 25) at 46.) Homar also had Levanowitz's demotion letter, which explained that the information contained in the supplemental report formed the basis for the demotion decision.

Connell, the union representative who attended the earlier meeting, Dave Pottiger, a union vice president, Homar and Levanowitz attended the meeting with Gilbert. The meeting lasted approximately 30 to 35 minutes. (Gilbert Statement (Dkt. Entry 21) ¶ 13.) Because Homar and his union representatives were concerned that Levanowitz's private discussions with Gilbert were possibly prejudicial to Homar, they requested that Levanowitz step out of the office during part of the meeting, which he did. (Homar Dep. (Dkt. Entry 25) at 46.) During his deposition, Pottiger affirmed that Gilbert provided Homar with a full opportunity to respond to the charges and the discipline Levanowitz imposed. (Pottiger Dep. (Dkt. Entry 24) at 22.)

By letter dated September 24, 1992, Gilbert informed Homar that it was his "decision to sustain the recommendation of Chief Marazas, Director Levanowitz, and Vice President English and your demotion stands as stated in our letter of September 23, 1992." (Levanowitz Dep (Dkt. Entry 26) Ex. 16.) Grievance procedures in the collective bargaining agreement covering Homar's employment were then utilized to challenge Homar's demotion. Homar's collective bargaining representative was free to present evidence in support of Homar's position. The State System of Higher Education denied the grievance at Step 3 and the Commonwealth's Office of Labor Relations, Bureau of Labor Relations denied the grievance at step 4. Although the union had the right to proceed to arbitration following the denial at Step 4, it elected to withdraw the matter.[4]

4. The Complaint does not explain why the

## II. DISCUSSION

### A. Preservation of the Challenge to the Timing of the Post–Suspension Hearing

█ In remanding this matter to this Court, the Third Circuit directed that consideration be given to "whether it is appropriate ... to entertain Homar's argument regarding the adequacy of the post-suspension procedures...." *Homar v. Gilbert*, No. 95–7218, slip op. at 3, 1998 WL 166850 (3d Cir. Mar. 9, 1998). Consistent with this directive, the parties were ordered to address whether Homar had pled in his complaint a claim for denial of procedural due process with respect to the timing and/or adequacy of post-suspension proceedings provided to Homar by the defendants. (Dkt. Entry 53.) Homar does not contend that such a procedural due process claim was explicitly pled in his complaint, but instead asserts that "the complaint pleads violations of substantive and procedural [due] process in a broad and general enough manner as to encompass such a claim." (Pl's Reply Br. (Dkt. Entry 58) at 7.) Defendants, pointing out that "[n]o allegation was included [in Homar's complaint] regarding defendants' alleged failure to afford him a timely due process hearing after his suspension," (Def's Opp.Br. (Dkt. Entry 57) at 2), assert that such a claim has not been preserved.

In Count I, which was entitled "Procedural Due Process," Homar alleged:

On August 26, 1992 Defendants James Gilbert, Gerald Levanowitz, David Marazas and Curtis English agreed and conspired to suspend Plaintiff without pay, without hearing, without notice, without an opportunity to be heard and without other procedural guarantees as set forth under the Pennsylvania Constitution and the Fourteenth Amendment to the United States Constitution.

(Complaint (Dkt. Entry 1) ¶ 39.) Although this allegation relates to the defendants' decision to suspend Homar, there is noth-

union withdrew its demand for arbitration.

ing to suggest that Homar was asserting a claim that defendants had violated his procedural due process rights in failing to provide a *post*-suspension hearing. Rather, the allegations in Count I clearly relate to the failure of defendants to provide a pre-suspension hearing. As determined by the United States Supreme Court, Homar's procedural due process rights were not violated by the defendants' failure to provide him with a *pre*-suspension hearing.

In Count II, which is entitled "Substantive and Procedural Due Process," Homar alleged that his substantive and procedural due process rights were violated because:

A. Plaintiff was deprived of his property including, but not limited to, his employment status as Police Officer arbitrarily, capriciously and in bad faith;

B. Plaintiff's suspension and demotion are without cause; ·

C. Plaintiff's *demotion* was a matter for which Plaintiff *was never given notice and an opportunity to be heard* and to the contrary, the meeting of September 18, 1992 was not a hearing in that Defendant took statements and did not allow Plaintiff's counsel to be present; and

D. The conduct taken by Defendants with regard herein were [sic] arbitrary, irrational, unlawful and tainted the grievance procedure followed by Plaintiff in accordance with his contractual rights.

(Complaint (Dkt. Entry 1) ¶ 42 (emphasis added).) The only reference to the suspension in Count II related to Homar's claim that he was suspended "without cause." The only procedural due process claim asserted in Count II relates to his ultimate demotion—not the failure of the defendants to provide him with a timely post-suspension hearing. Therefore, it is apparent that Homar did not explicitly allege a procedural due process violation in relation to the defendants' failure to provide him with a timely post-suspension hearing.

It is, however, evident that Homar did generally allege that his right to procedural due process was violated in connection with his suspension. As noted by the Supreme Court, even if there is no right to a pre-suspension opportunity to be heard, there is a right to a prompt post-suspension hearing. *See, e.g., Barry v. Barchi,* 443 U.S. 55, 66, 99 S.Ct. 2642, 61 L.Ed.2d 365 (1979). Clearly, a claim for denial of due process in connection with a suspension would encompass the adequacy of the process provided, whether that occurred before or after the suspension went into effect. Accordingly, I find that the issue of whether the timing of the post-suspension hearing was sufficiently prompt was fairly encompassed by the pleadings.[5]

## B. Procedural Due Process Claim—Post–Suspension Hearing

■ In its opinion, the Third Circuit determined that Homar's procedural due

---

**5.** Whether Homar preserved this issue in his appellate briefing presents a separate question. There is no dispute that he did not brief the issue on the defendants' summary judgment motion. Moreover, he concedes that he did not raise the question when he briefed his appeal to the Third Circuit. *See Homar v. Gilbert,* No. 95–7218, slip op. at 3, 1998 WL 166850 (3d Cir. Mar. 9, 1998). As a general rule, failure to raise an issue on appeal results in its waiver. *See United States v. Voigt,* 89 F.3d 1050, 1064 n. 4 (3d Cir.) ("The failure to raise a theory as an issue on appeal constitutes waiver ... [and] briefs must contain statements of all issues presented for appeal, together with supporting arguments...."

(emphasis in original) (internal citations omitted)), *cert. denied,* 519 U.S. 1047, 117 S.Ct. 623, 136 L.Ed.2d 546 (1996); *Nagle v. Alspach,* 8 F.3d 141, 143 (3d Cir.1993) ("When an issue is either not set forth in the statement of issues presented or not pursued in the argument section of the brief, the appellant has abandoned and waived that issue on appeal."), *cert. denied,* 510 U.S. 1215, 114 S.Ct. 1337, 127 L.Ed.2d 685 (1994). The Court of Appeals expressed no view on this issue. Because I find the timeliness of post-suspension process to be subsumed within Homar's due process challenge to his suspension, I will address it notwithstanding the substantial waiver issue presented.

process rights may have been violated in two respects: (1) that he was suspended without pay without a *pre*-suspension hearing; and (2) that he was demoted from campus police officer to grounds keeper without a *pre*-deprivation hearing. *Homar,* 89 F.3d at 1014–21.[6] The Third Circuit did not address whether Homar's procedural due process rights were violated with respect to the timing of any post-suspension hearing. *Id.* at 1025 (Alito, J., concurring in part and dissenting in part). As noted by a unanimous United States Supreme Court:

> Whether [Homar] was provided an adequately prompt post-suspension hearing in the present case is a separate question. Although the charges against [Homar] were dropped on September 1 ( [defendants] apparently learned of this on September 2), he did not receive any sort of hearing until September 18. Once the charges were dropped, the risk of erroneous deprivation increased substantially, and, as [defendants] conceded at oral argument, there was likely value in holding a prompt hearing. *Because neither the Court of Appeals nor the District Court addressed whether under the particular facts of this case, [defendants] violated due process by failing to provide a sufficiently prompt post-suspension hearing, we will not consider this issue in the first instance, but remand for consideration by the Court of Appeals.*

**6.** There is no question that the procedures provided on September 24th passed constitutional muster. As our Court of Appeals explained: "Given that Homar was afforded an opportunity to review the supplemental report and offer meaningful responses to the allegations, ... this meeting afforded Homar with sufficient procedural due process protections *assuming it took place prior to his demotion becoming effective.*" *Homar,* 89 F.3d at 1019 (emphasis in original). The Court of Appeals, however, disagreed with my conclusion that the September 24th hearing occurred before the demotion became effective, explaining:

> There is substantial evidence in the record to support the conclusion that Homar's de-

*Gilbert,* 520 U.S. at 935–36, 117 S.Ct. 1807 (emphasis added).

As Homar observes, "no post-suspension hearing was provided ... until September 18, 1992 when plaintiff was given the opportunity to meet with ... Levanowitz...." (Pl's Supp.Br. (Dkt. Entry 54) at 11.) Asserting that he was entitled to be heard on the suspension "immediately after the dismissal of [the criminal] charges [on September 1, 1992]," Homar contends that "the delay between suspension and the post-suspension opportunity to be heard was so long as to violate procedural due process." (*Id.* at 15–16.)

The principles of due process indeed required that Homar be provided with a prompt post-suspension hearing. *See Barry,* 443 U.S. at 66, 99 S.Ct. 2642. But due process is a fluid concept which adapts itself to the factual circumstances presented by each case. *Gilbert,* 520 U.S. at 930, 117 S.Ct. 1807; *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972) ("[D]ue process is flexible and calls for such procedural protections as the particular situation demands."); *Reynolds v. Wagner,* 128 F.3d 166, 179 (3d Cir.1997) ("The procedural protections required by the Due Process Clause are determined with reference to the particular rights and interests at stake in the case."). In assessing the timeliness of a post-suspension hearing, the United States Supreme Court has stated:

> In determining how long a delay is justified in affording a post-suspension hear-

> motion took effect prior to [the September 24, 1992 meeting with Gilbert].... There is ... evidence suggesting that Homar had already been demoted to groundskeeper by the time this meeting took place. If this is true, then Homar was deprived of a meaningful pre-deprivation hearing.

*Id.* at 1019. Concluding that "there is a genuine issue of material fact regarding the date and time at which Homar's demotion became effective," *id.* at 1020, the Third Circuit reversed the grant of summary judgment "regarding Homar's meaningful pre-deprivation hearing." *Id.*

ing and decision, it is appropriate to examine the importance of the private interest and the harm to this interest occasioned by the delay; the justification offered by the Government for delay and its relation to the underlying governmental interest; and the likelihood that the interim decision may have been mistaken.

*FDIC v. Mallen,* 486 U.S. 230, 242, 108 S.Ct. 1780, 100 L.Ed.2d 265 (1988); *see also Reynolds,* 128 F.3d at 179 ("The factors to be considered are the private interests at stake, the governmental interests, and the value of procedural requirements in that particular context.").

In *Mallen,* the plaintiff, a bank president, was suspended without a hearing after he was indicted on felony charges relating to making false statements to the FDIC. The FDIC had statutory authority to suspend any bank president who posed a "threat to the interests of the bank's depositors or [who might] threaten to impair public confidence in the bank." *Id.* at 237, 108 S.Ct. 1780 (quoting 12 U.S.C. § 1818(g)(3)). Pursuant to this authority, on January 20, 1987, the FDIC issued an ex parte order suspending the plaintiff without pay. *Id.* Plaintiff was served with a copy of this order on January 26, 1987. Four days after plaintiff received the notice of his suspension, his attorney demanded " 'an immediate administrative hearing' at which he proposed to offer both oral testimony and written evidence' to establish that [plaintiff's] continued service was not likely to pose a threat to the interests of the bank's depositors or to threaten public confidence in the bank." *Id.* An administrative post-suspension hearing was scheduled for February 18, 1987, but never occurred because the

plaintiff filed a civil rights action of February 6, 1987. *Id.*

In considering the relevant statutory authority, the Court stated:

Section 1818(g)(3) requires the FDIC to hold a hearing within 30 days of a written request for an opportunity to appear before the agency to contest a suspension and requires that it notify the suspended officer of its decision within 60 days of the hearing. Thus, at maximum, the suspended officer receives a decision within 90 days of his or her request for a hearing. In this case, the agency reported that it would have been able to issue a written decision within 30 days after the hearing. In addition, the initial hearing was scheduled to take place—had it not been interrupted by [litigation]—19 days after it was formally requested.

*Id.* at 242–43, 108 S.Ct. 1780 (footnote omitted). The court noted that the plaintiff's interest in continued employment was an "important interest that ought not be interrupted without substantial justification." *Id.* at 243, 108 S.Ct. 1780. Despite the danger of "depriving [plaintiff] of his . . . livelihood," the Court decided that the principles of procedural due process would not have been violated even if it took the agency the entire 90 days to hear and decide the post-suspension claims. *Id.* The court noted that the government had a significant interest in maintaining the suspension, *i.e.,* protecting the integrity of the banking industry. *Id.* at 244, 108 S.Ct. 1780. The court recognized that there was less concern over erroneous deprivation because the plaintiff had been indicted by a grand jury—an independent factfinder. *Id.*[7] After weighing all of these factors, the Court concluded: "We are therefore persuaded that the congressionally recognized

---

7. The Court also addressed the contention that the underlying criminal proceeding might conclude prior to the post-suspension administrative hearing. *Id.* at 247, 108 S.Ct. 1780. The Court determined that no danger arose if parallel proceedings developed; rather, the criminal proceedings would simply

provide an additional forum. *Id.* ("If the official is successful in the criminal proceeding, then due process has prevailed and the order of suspension must be vacated. If he or she is convicted, the order of suspension is further supported.").

interest in maintaining confidence in our banking institutions, coupled with the finding of probable cause that the officer has committed a felony involving dishonesty, is sufficient ground for a regulatory suspension of up to 90 days without the benefit of a post-suspension ruling." *Id.* at 245, 108 S.Ct. 1780.[8]

In this case, the delay between Homar's suspension and the post-suspension hearing did not approach the ninety days that was held sufficient in *Mallen.* Homar was suspended on August 26 and received a post-suspension hearing on September 18, a period of 23 days.[9] In determining whether the post-suspension hearing was reasonably prompt, the relevant factors must be balanced. As noted throughout this case, Homar had a significant interest in his continued employment. Moreover, because Homar was suspended without pay, his suspension had a more harmful effect. Any delay in the post-suspension hearing was offensive with respect to Homar's interest in his employment and livelihood.

In terms of the government's justification for the delay, the defendants have indicated that the allegations against Homar were being investigated by University officials. Given Homar's position as a

---

**8.** Homar relies upon *Barry v. Barchi,* 443 U.S. 55, 99 S.Ct. 2642, 61 L.Ed.2d 365 (1979), in which the Court considered a 15 day suspension of a horse trainer without a pre-suspension hearing based upon a positive drug test from one of the trainer's horses. *Id.* at 59, 99 S.Ct. 2642. The Court approved of the suspension of the trainer without a pre-suspension hearing. *Id.* at 65, 99 S.Ct. 2642. The relevant statute, however, failed to provide for any post-suspension hearing. As to this matter, the Court concluded:

> That the State's presuspension procedures were satisfactory, however, still leaves unresolved how and when the adequacy of the grounds for suspension is ultimately to be determined.... Here, the provision for an administrative hearing, neither on its face *nor as applied in this case,* assured a prompt proceeding and prompt disposition of the outstanding issues between [the trainer] and the State. Indeed, insofar as the statutory requirements are concerned, it is as likely as not that [the trainer] and others subject to relatively brief suspensions would have no opportunity to put the State to its proof until they have suffered the full penalty imposed.... Once suspension has been imposed, the trainer's interest in a speedy resolution of the controversy becomes paramount, it seems to us. We also discern little or no state interest ... in an appreciable delay in going forward with a full hearing....
>
> In these circumstances, it was necessary that [the trainer] be assured a prompt post-suspension hearing, one that would proceed and be concluded without appreciable delay. Because the statute *as applied in this case* was deficient in this respect, [the trainer's] suspension in this case was constitutionally infirm under the Due Process Clause of the Fourteenth Amendment.

*Id.* at 66, 99 S.Ct. 2642 (emphasis added). Homar argues that the relevant state statute in this case likewise fails to provide for a prompt and reliable post-suspension hearing. (Pl's Supp.Br. (Dkt. Entry 54) at 14 n. 2) (citing 4 P.A.Code § 7.173 ("As soon as practicable after an employee has been formally charged with criminal conduct ... which constitutes a felony, the employee shall be suspended without pay. If the charge results in conviction in a court of law, the employee shall be terminated.").) Thus, Homar contends that, like *Barry,* the defendants had no obligation under state law to provide a timely post-suspension hearing. First, it is questionable whether § 7.173 even applies to this case as it covers only to agencies under the jurisdiction of the Governor as well as employees appointed by the governor. 4 Pa.Code § 7.171. More importantly, this case differs significantly from *Barry,* which noted that the statutory provisions were not only deficient on their face, but also as applied. Despite any relevant regulatory provisions, Homar was provided with a post-suspension hearing on September 18, 1992. Thus, as compared to *Barry,* this case involves consideration, not of relevant regulatory provisions relating to post-suspension hearings, but rather to the timing of the post-suspension hearing that was in fact provided. The existence of the grievance procedure in the collective bargaining agreement negotiated by Homar's union and actually followed in this case further distinguishes this case from *Barry.*

**9.** The United States Supreme Court recognized that the September 18 meeting between Homar, Levanowitz and Marazas constituted Homar's post-suspension hearing. *Gilbert,* 520 U.S. at 935, 117 S.Ct. 1807.

campus police officer, the government had a significant interest in assuring that he was not engaged in illicit drug-related activities. Any investigation into the charges against Homar would relate directly to the interest in assuring that its campus security officers were not engaged in felonious conduct. Moreover, initially, there was little concern that the decision to suspend Homar was erroneous given that he had been charged by the Pennsylvania State Police with a criminal complaint for possession with intent to deliver and criminal conspiracy to violate the controlled substance law. This determination by an independent third party assured that Homar's suspension was not "baseless or unwarranted." *Gilbert,* 520 U.S. at 934, 117 S.Ct. 1807.

■ On September 1, a Pennsylvania state court dismissed the charges against Homar. Levanowitz learned of the dismissal the next day (September 2), but continued his own investigation. In reference to the dismissal of the criminal charges, the United States Supreme Court stated: "Once the charges were dropped, the risk of erroneous deprivation increased substantially, and ... there was likely value in holding a prompt hearing." *Gilbert,* 520 U.S. at 935, 117 S.Ct. 1807. Thus, it must be determined whether the delay between September 2 (the date that Levanowitz learned that the charges against Homar had been dismissed) and September 18 (the date of the post-suspension hearing) violated Homar's procedural due process right to a have a prompt post-suspension hearing.

In this case, only 16 days elapsed between Levanowitz learning of the dismissal of the charges against Homar and the post-suspension hearing. During that time period, Levanowitz was not sitting idle. On September 11, 1992, Levanowitz met with the state police to inquire about Homar's arrest. The state police provided a copy of the supplemental report to Levanowitz. Moreover, Trooper George told Levanowitz that Homar had been in a

home where marijuana was in plain view, that Homar had been seated near a coffee table upon which five marijuana joints were located, and that it appeared that Homar threw a metal plate used for cutting and processing marijuana when the police entered the home.

In *Jones v. City of Gary,* 57 F.3d 1435 (7th Cir.1995), the plaintiff, a firefighter, was having a dispute with his employer, the City of Gary, regarding his entitlement to disability pension benefits. Plaintiff repeatedly refused to comply with orders directing him to return to work after it had been determined that he was not disabled. Plaintiff was suspended without pay and without a hearing on several occasions. On one of those occasions, plaintiff was provided with a post-suspension hearing three months after the initial suspension without pay. *Id.* at 1445. On the other occasion, plaintiff was provided with a post-suspension hearing six months after another suspension without pay. *Id.* at 1445. While the court recognized that plaintiff had a significant interest in his continued employment and receipt of a wage, the court refused to find a due process violation from the three and six month delays between the suspensions and the post-suspension hearings. The court noted that plaintiff's claim that he was disabled, and thereby not required to work, had been reviewed and rejected by independent medical examiners such that the risk of an erroneous deprivation was slight. Moreover, the court also noted that the City of Gary had a significant interest in assuring that its fire department had a complete complement of capable firefighters. Plaintiff's refusal to return to work clearly threatened the public safety.

In contrast to the three and six month delays that were determined to be permissible in *Jones,* Homar was provided a post-suspension hearing within 16 days of the dismissal of the criminal charges against him. Although Homar had a substantial interest in his continued uninterrupted em-

ployment, the University's interest in investigating the alleged criminal wrongdoing of a campus police officer was also significant. The significance of this interest provided the University with ample justification to investigate the circumstances surrounding Homar's arrest notwithstanding the dismissal of the criminal charges. Knowing association with drug dealers may warrant removal of a campus police officer even though the campus police officer does not commit a crime by such association. And where, as here, a University has reasonable grounds to believe that such a relationship exists, it has the right to conduct a prompt investigation while the police officer is suspended. In other words, contrary to Homar's assertion, the dismissal of the criminal charges did not necessarily eliminate the basis for the suspension.[10] Moreover, Homar never objected to the failure of the University to give him a post-suspension hearing during this 16 day period.[11] Given the circumstances of this case, a 16 day delay does not rise to the level of a procedural due process violation; rather, Homar was provided with an adequately prompt post-suspension hearing as required by procedural due process.[12]

## C. Substantive Due Process[13]

"[N]ot all property interests worthy of due process protections are protect-

10. *Mallen* suggested in *dicta* that a favorable disposition of criminal charges would require that a suspension be vacated. *Mallen*, 486 U.S. at 247, 108 S.Ct. 1780 ("If the official is successful in the criminal proceeding, the due process has prevailed and the order of suspension must be vacated."). In the context of this case, however, the Court recognized that favorable termination of the criminal proceedings against Homar only "increased substantially" the risk of an erroneous deprivation. *Gilbert*, 520 U.S. at 935, 117 S.Ct. 1807. The Court did not intimate that the dismissal of the criminal charges mandated that Homar's suspension be vacated. Rather, it is clear that the Court intended that a balancing of the relevant factors be conducted to determine whether the post-suspension hearing was timely.

11. In this respect, it should be noted that Homar's rights were also protected under a collective bargaining agreement. The collective bargaining agreement provides that an employee may appeal a suspension within 15 days of the date of its occurrence, and the employee's supervisor is given 15 days within which to make his decision. (Pl's Supp.Br. (Dkt. Entry 54) Ex. A, Art. 28, § 1; Art. 37, § 2.) Homar's post-suspension proceedings occurred within these time strictures. The fact that the collective bargaining agreement contemplated that 30 days could elapse between a suspension and supervisor's response to a grievance cuts against Homar's assertion in this case.

12. Neither party has addressed the adequacy of the process provided on September 18, 1992. In the context of the decision to demote Homar, I found the process to be inadequate because Levanowitz did not disclose the damaging information in the supplemental report, thereby depriving Homar of the opportunity to respond to it. The Court of Appeals agreed with this determination. *Homar*, 89 F.3d at 1018–19. As noted above, the Third Circuit also agreed with my determination that the September 24th hearing was adequate in that Homar was given the opportunity to respond to the supplemental report at that time. It has been recognized that "the state may cure a procedural deprivation by providing a later procedural remedy; only when the state refuses to provide a process sufficient to remedy the procedural deprivation does a constitutional violation actionable under section 1983 arise." *McKinney v. Pate*, 20 F.3d 1550, 1557 (11th Cir.1994) (*en banc*), *cert. denied*, 513 U.S. 1110, 115 S.Ct. 898, 130 L.Ed.2d 783 (1995). Consistent with this proposition, the inadequacy of the September 18th proceeding would not entitle Homar to relief because the defendants expeditiously rectified the deficiency on September 24th.

13. In the March 17, 1995 Memorandum and Order, I determined that Homar had failed to proffer sufficient evidence of bias, bad faith or improper motive necessary to support a substantive due process claim. (Dkt. Entry 34, at 23.) In response, the Third Circuit found that a question of material fact existed regarding whether ESU officials acted in bad faith. *Homar*, 89 F.3d at 1020. The Third Circuit, however, concluded that "[a] more fundamental legal question must first be addressed, namely whether Homar's property interest in his state-created job is an interest worthy of protection under substantive due process." *Id.* at 1021. The parties have filed supplemental briefs on this issue and it is ready for disposition.

ed by the concept of substantive due process." *Reich v. Beharry*, 883 F.2d 239, 244 (3d Cir.1989). Rather, "only fundamental property interests are worthy of such protection." *DeBlasio v. Zoning Bd. of Adjustment for the Township of West Amwell*, 53 F.3d 592, 598 (3d Cir.), *cert. denied*, 516 U.S. 937, 116 S.Ct. 352, 133 L.Ed.2d 247 (1995). Such an approach is compelled by the United States Supreme Court admonition that any expansion of substantive due process should be taken with the "utmost care." *Collins v. City of Harker Heights*, 503 U.S. 115, 124, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992); *see also Bowers v. Hardwick*, 478 U.S. 186, 195, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986) (noting that courts should show "great resistance" to the expansion of substantive due process and in "redefining the category of rights deemed to be fundamental"). In this case, it must be determined whether tenured public employment rises to the level of a fundamental property interest protected by substantive due process.[14]

The United States Supreme Court has not directly addressed this issue. In *Harrah Independent School Dist. v. Martin*, 440 U.S. 194, 99 S.Ct. 1062, 59 L.Ed.2d 248 (1979), a school board voted not to renew the plaintiff-teacher's contract. In considering the plaintiff's due process claim, the Court noted that the Due Process Clause provides procedural safeguards to protected interests and "protects substantive aspects of liberty against impermissible governmental restrictions." *Id.* at 197, 99 S.Ct. 1062. After applying a rational basis analysis, the Court concluded that the school board's decision was not arbitrary. Thus, the Court suggested that tenured public employment did raise substantive due process concerns. *Id.* at 199, 99 S.Ct. 1062.

In *Regents of the University of Michigan v. Ewing*, 474 U.S. 214, 106 S.Ct. 507, 88 L.Ed.2d 523 (1985), the plaintiff claimed he had a protected property interest in enrollment in medical school after the defendant expelled him from medical school. The Court *assumed*, without deciding, that the plaintiff had asserted a property interest protected under substantive due process. The Court, however, found that the school had not acted arbitrarily in its decision to deny plaintiff's continued enrollment. *Id.* at 223, 106 S.Ct. 507. Justice Powell, in a separate concurring opinion, rejected the notion that substantive due process protection applied to any state-created property interest. *Id.* at 229, 106 S.Ct. 507 (Powell, J., concurring). Justice Powell stated:

Even if one assumes the existence of a property right, however, not every such right is entitled to the protection of substantive due process. While property interests are protected by procedural due process even though the interest is derived from state law rather than the Constitution, substantive due process rights are created only by the Constitution.

The history of substantive due process "counsels caution and restraint." The determination that a substantive due process right exists is a judgment that " 'certain interests require particularly careful scrutiny of the state needs asserted to justify their abridgement.' " In the context of liberty interests, this Court has been careful to examine each asserted interest to determine whether it "merits" the protection of substantive due process. "Each new claim to [substantive due process] protection must be considered against a background of Constitutional purposes, as they have been rationally perceived and historically developed."

*The interest asserted by respondent ... is essentially a state-created contract right. It bears little resemblance to the fundamental interests that previously have been viewed as implicitly protected by the Constitution. It cer-*

14. By "tenured" public employment, I mean that, under the terms of his collective bargaining agreement, Homar could only be demoted, suspended or discharged for just cause.

*tainly is not closely tied to "respect for the teachings of history, solid recognition of the basic values that underlie our society, and wise appreciation of the great roles that the doctrines of federalism and separation of powers have played in establishing and preserving American freedoms." For these reasons, briefly summarized, I do not think the fact that Michigan may have labeled this interest "property" entitles it to join those other, far more important interests that have heretofore been accorded the protection of substantive due process.*

*Id.* at 229, 106 S.Ct. 507 (citations omitted) (emphasis added).

In *Harrah* and *Ewing*, the United States Supreme Court appeared to recognize implicitly that a state-created property interest was entitled to protection under the substantive due process clause. In both those cases, however, the Court only summarily addressed the existence of a protectable property interest in reaching its determination that, even if such an interest existed, no constitutional violation had occurred. "Justice Powell's concurring opinion also casts some doubt on the existence of a substantive due process right in the area of public employment." *Lum v. Jensen,* 876 F.2d 1385 (9th Cir. 1989) (finding that defendants were entitled to qualified immunity as to plaintiff's substantive due process claim), *cert. denied,* 493 U.S. 1057, 110 S.Ct. 867, 107 L.Ed.2d 951 (1990).

Like the United States Supreme Court, the Third Circuit has not provided any definitive decision on the viability of a substantive due process claim for termination of state employment. *See McKnight v. Southeastern Pa. Transp. Auth.,* 583 F.2d 1229, 1233 n. 4 (3d Cir. 1978) (remanding to district court to determine whether state-created property interest in employment was entitled to substantive due process protection). Our Court of Appeals has, however, endorsed an approach to the issue that focuses on the nature of the property interest at stake.[15] The Third Circuit has determined that real property "ownership is a property interest worthy of substantive due process protection." *DeBlasio,* 53 F.3d at 600 (finding that in land use context, a plaintiff may state a substantive due process claim where it is alleged that the "the decision limiting the intended land use was arbitrary and irrationally reached"). The Third Circuit, however, has determined that service contracts with the state fail to merit substantive due process protection. *See Independent Enters., Inc. v. Pittsburgh Water & Sewer Auth.,* 103 F.3d 1165, 1180 (3d Cir.1997) (holding that water and sewer authority's denial of an award of contract to construction company with low bid did not implicate the type of "fundamental" interest entitled to protection of substantive due process); *Reich,* 883 F.2d at 243–44 (finding an interest in prompt receipt of payment for professional services provided to the state is not of a "certain quality" of property interest worthy of due process protection). Moreover, the Third Circuit has suggested that purely state-created "property" rights are not entitled to substantive due process protection. *See Ransom v. Marrazzo,* 848 F.2d

---

15. Dissenting from the *en banc* majority decision in *Singleton v. Cecil,* 176 F.3d 419, 430–33 (8th Cir.1999), Judge Richard Arnold argued that undue expansion of substantive due process is not to be avoided by restricting the type of property or liberty interest that deserves protection. Instead, Judge Arnold asserts, to avoid "substantive-due-process sprawl," courts must "be very careful about the circumstances in which the door [of the courthouse] is opened." *Id.* at 433. According to Judge Arnold, Supreme Court prece-

dents, particularly *County of Sacramento v. Lewis,* 523 U.S. 833, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998), require a plaintiff challenging executive action to demonstrate conduct that "shocks the judicial conscience." *Id.* Because this matter was remanded to consider whether Homar's public employment was of that "certain quality" of property interest that merits substantive due process protection, the approach advocated by Judge Arnold is outside the purview of the remand order.

398 (3d Cir.1988) (finding that state law entitlement to water and sewage services fails to implicate rights protected by substantive due process); *Mauriello v. University of Med. & Dentistry of N.J.*, 781 F.2d 46, 50 (3d Cir.) (suggesting in dictum that student's right to continued enrollment in a graduate program does not rise to constitutional proportions), *cert. denied,* 479 U.S. 818, 107 S.Ct. 80, 93 L.Ed.2d 35 (1986). Thus, in remanding this matter, the Third Circuit noted: "[T]he case law of this circuit and the Supreme Court provides very little guidance as to what constitutes this 'certain quality' of property interest worthy of protection under the substantive due process clause.... Given the complexity of this issue, we think it appropriate to allow the district court the first opportunity to consider it." *Homar,* 89 F.3d at 1021.[16]

In his concurring and dissenting opinion in this case, Judge Alito conducted a careful analysis of the potential expansion of substantive due process to cover tenured public employees. In particular, Judge Alito endorsed the approach followed by the Eleventh Circuit in *McKinney v. Pate,* 20 F.3d 1550 (11th Cir.1994) (*en banc*), *cert. denied,* 513 U.S. 1110, 115 S.Ct. 898, 130 L.Ed.2d 783 (1995). Thus, *McKinney* warrants special consideration.[17]

In *McKinney,* the court considered "whether, under the Fourteenth Amendment, a government employee possessing a state-created property interest in his employment states a substantive due process claim, rather than a procedural due process claim, when he alleges that he was deprived of the employment interest by an arbitrary and capricious non-legislative government action." *McKinney,* 20 F.3d at 1553.[18] In making a distinction between

**16.** One commentator, in attempting to reconcile *Reich* and *DeBlasio,* stated:

> In fact, the Third Circuit has recognized a distinction without a difference. Reich's interest in collecting his fee is economically no different than DeBlasio's interest in operating his shop. Both claimed that government officials burdened their enjoyment of property rights for irrational or arbitrary reasons. To hold that DeBlasio stated a valid substantive due process claim while Reich did not is simply nonsensical. Accordingly, in the aftermath of DeBlasio it is difficult to state the law of the Third Circuit regarding the status of substantive due process property claims. (Perhaps auto mechanics enjoy substantive due process protection while attorneys do not, with the precise rights of other professions to be determined.)
>
> The problem stems from the *Reich* panel's refusal to recognize a substantive due process claim for wholly arbitrary and irrational government actions or to apply a suitably deferential standard of review in such cases. The *DeBlasio* panel held—quite correctly—that substantive due process affords an avenue of relief when wholly arbitrary government action burdens a state-created property interest. Of course, all property interests, whether or not "fundamental," should be afforded protection under the basic rationality requirement; on the other hand, only fundamental property interests should benefit from heightened judicial scrutiny. Unfortunately, *Reich*

missed this point entirely, and *DeBlasio* failed to correct it. The result is a muddled substantive due process jurisprudence that lacks both consistency and coherence.

Ronald J. Krotoszynski, Jr., "Fundamental Property Rights," 85 Geo.L.J. 555, 578–79 (1997). Although Professor Krotoszynski, like Judge Arnold in *Singleton,* contends that substantive due process principles should apply to any property interest, I am bound by Third Circuit precedent, which clearly indicates that only "fundamental" property interests are protected by substantive due process.

**17.** Homar argues that the panel's refusal to specifically adopt *McKinney,* as suggested by Judge Alito, is significant. The majority, however, did not indicate any fundamental disagreement with the approach taken in *McKinney.* Rather, the matter was remanded to allow the district court the "first opportunity" to consider the substantive due process claim. The Third Circuit noted that "[s]hould this issue return to us on appeal, we will benefit from the district court's analysis." *Homar,* 89 F.3d at 1021. It is clear that the majority refused to address *McKinney* for prudential reasons, not because it disagreed with the holding.

**18.** Prior to *McKinney,* the Eleventh Circuit allowed a terminated public employee to state a substantive due process claim where the termination was "made through pretextual means to disguise an improper motive." *Id.* at 1559.

"legislative" and "non-legislative" adverse employment actions, the court determined that "in non-legislative cases, only procedural due process claims are available to pretextually terminated employees." *Id.* at 1560.[19] As the court stated:

> When [relevant Supreme Court cases] are examined, it becomes evident that the law in this circuit diverges from the Supreme Court precedent.... [U]nlike our cases, the Supreme Court precedent demonstrates that an employee with a property right in employment is protected only by the procedural component of the Due Process Clause, not its substantive component. Because employment rights are state-created rights and are not "fundamental" rights created by the Constitution, they do not enjoy substantive due process protection.

*Id.* at 1560; *accord Thornquest v. King,* 82 F.3d 1001, 1003 n. 2 (11th Cir.1996) ("[Plaintiff's] substantive due process claim similarly arises from defendant's alleged violation of his state-created non-fundamental property right in his employment. Accordingly, like *McKinney,* [plaintiff] does not state a cognizable substantive due process claim."); *C.B. v. Driscoll,* 82 F.3d 383, 387 (11th Cir.1996) (finding that right to attend public school was a state-created, not fundamental, right and that nine day suspension did not implicate substantive due process).[20]

After considering *McKinney,* Judge Alito agreed with the Eleventh Circuit and concluded that allowing Homar to maintain a substantive due process claim "would elevate Homar's procedural challenges to substantive due process status." *Homar,* 89 F.3d at 1027. Other courts have likewise concluded that an adverse employment action with respect to a tenured public employee raises only procedural, not substantive, due process claims. *See Valot v. Southeast Local Sch. Dist. Bd. of Educ.,* 107 F.3d 1220, 1233 (6th Cir.) ("Clearly, state-created employment benefits ... are not 'fundamental' rights created by the Constitution, and therefore they do not enjoy substantive due process protection.") (Ryan, J., concurring), *cert. denied,* —— U.S. ——, 118 S.Ct. 164, 139 L.Ed.2d 108 (1997); *Sutton v. Cleveland Bd. of Educ.,* 958 F.2d 1339, 1350–51 (6th Cir.1992) (finding that substantive due process not concerned with "garden variety" common law contract claims such as those arising from the termination of state employment); *Charles v. Baesler,* 910 F.2d 1349, 1353 (6th Cir.1990) ("Most, if not all, state-created contract rights, while assuredly protected by procedural due process, are not protected by substantive due process."); *Myers v. Town of Landis,* 957 F.Supp. 762, 770 (M.D.N.C.1996) ("[A]ny right that [plaintiff] may have had to continued employment with the Town of Landis is not protected by substantive due process. Substantive due process protects

19. Judge Alito viewed this distinction between "legislative" and "executive" acts as crucial. *Homar,* 89 F.3d at 1027. ("Executive acts, such as employment decisions, typically apply to one person or to a limited number of persons, while legislative acts, generally laws and broad executive regulations, apply to large segments of society."). Judge Alito agreed with the Eleventh Circuit's determination that "rational basis review under the substantive component of the Due Process Clause is appropriate only in the context of legislative action." *Id.*

20. Professor Krotoszynski criticized *McKinney* as follows:
> In sum, the Eleventh Circuit properly ... conclud[ed] that substantive due process

does protect "fundamental" property interests in the same fashion that it protects fundamental liberty interests. However, *McKinney*'s substantive due process analysis remains incomplete (and deeply flawed) because it fails to recognize that the doctrine also protects citizens from wholly irrational government action regardless of the nonfundamental nature of the right at issue. Ronald J. Krotoszynski, Jr., "Fundamental Property Rights," 85 Geo.L.J. 555, 578 (1997). As noted above, controlling Third Circuit precedent dictates that the protections provided by substantive due process apply only to "fundamental" property interests. Thus, *McKinney* is consistent with Third Circuit precedent.

fundamental rights created by the Constitution. [Plaintiff's] right to his job, if any, was created by state contract law, and does not implicate substantive due process."), *aff'd mem.*, 107 F.3d 867, 1997 WL 71705 (4th Cir.1997); *Wallace v. City of Montgomery*, 956 F.Supp. 965, 980 (M.D.Ala.1996) (finding that state employer's decision to demote tenured state employee does not implicate substantive due process); *Reinhart v. City of Maryland Heights*, 930 F.Supp. 410, 413 (E.D.Mo. 1996) (finding no substantive due process right to public employment); *Cibas v. Lockwood*, No. 90–0341J, 1994 WL 924145, at *30 (D.N.M. Aug.22, 1994) ("The Court finds that the Eleventh Circuit's reasoning is clear and well thought out and should therefore be adopted. The Court finds, therefore, that Plaintiff's due process remedy is limited to the protections of procedural due process, and does not include a claim under the substantive portions of the Due Process Clause."); *cf. Local 342, Long Island Public Serv. Employees v. Town Bd. of Huntington*, 31 F.3d 1191, 1196 (2d Cir.1994) ("We do not think, however, that simple, state-law contractual rights, without more, are worthy of substantive due process protection."); *Coover v. Saucon Valley Sch. Dist.*, 955 F.Supp. 392, 402 (E.D.Pa.1997) (noting that plaintiff conceded that no substantive due process right arises from tenured public employment); *Lei v. Brown*, No. 97–845, 1997 WL 634506, at *8 (E.D.Pa. Oct.8, 1997) (finding that termination of tenured public employee does not implicate substantive due process); *Hassel v. Neal*, No. 96–813, 1997 WL 269575, at *4 (E.D.Pa. May 16, 1997) ("It is disputable whether continued public employment implicates substantive due process concerns."); *Austin v. Neal*, 933 F.Supp. 444, 453 (E.D.Pa.1996) ("A right to be discharged from public employment only for cause, however, does not seem on its face to be 'implicit in the concept of ordered liberty' or 'deeply rooted in this Nation's history and tradition.' " (quoting *Bowers*, 478 U.S. at 191–92, 106 S.Ct. 2841)).[21]

There is, however, a substantial countervailing body of case law. *See Newman v. Massachusetts*, 884 F.2d 19, 25 (1st Cir.1989) ("We are persuaded that at the time defendants acted it was clearly established in our circuit that school authorities who make an arbitrary and capricious decision significantly affecting a tenured teacher's employment status are liable for a substantive due process violation."), *cert. denied*, 493 U.S. 1078, 110 S.Ct. 1132, 107 L.Ed.2d 1037 (1990); *Moore v. Warwick Public Sch. Dist. No. 29*, 794 F.2d 322, 329 (8th Cir.1986) (finding that discharged public school superintendent had a substantive due process right to avoid an arbitrary and capricious employment termination).[22] Other courts have simply accepted that the arbitrary and capricious termination of public employment creates a substantive due process right without any serious analysis.

21. In *Austin*, the court indicated that it could not predict with any confidence that the Third Circuit "would decline to hold that the termination of tenured public employment implicates substantive due process concerns." 933 F.Supp. at 453. *Austin*, however, was decided before the Third Circuit's opinion in *Homar* and did not have the benefit of Judge Alito's concurring opinion. Judge Alito expressed his fear that Third Circuit substantive due process jurisprudence had become too permissive. Thus, with reference to Homar's assertion that he had a substantive due process claim, Judge Alito concluded:

In sum, substantive due process applies where there is a fundamental right at stake or legislation is challenged as having no rational relationship to any legitimate governmental interest. Here, [Homar] suggests *no fundamental right within the meaning of the substantive component of the Due Process Clause;* nor is [Homar] challenging a legislative act on rational basis grounds. In my view, then, plaintiff has no substantive due process claim on the undisputed facts presented.

*Homar*, 89 F.3d at 1030 (emphasis added).

22. In *Singleton*, the *en banc* Eighth Circuit held that an at-will public employee did not have a liberty interest in public employment protected by substantive due process. 176 F.3d at 428.

576

See *O'Neal v. City of Hot Springs Nat'l Park*, 756 F.2d 61, 63 (8th Cir.1985) (suggesting that arbitrary and capricious discharge of public employee could violate substantive due process); *Brenna v. Southern Col. State College*, 589 F.2d 475, 476 (10th Cir.1978) ("Professor Brenna was tenured and thus had a property interest deserving of the procedural and substantive protections of the Fourteenth Amendment."); *Miller v. Dean*, 552 F.2d 266, 268 (8th Cir.1977) (suggesting that arbitrary and capricious discharge of public employee could violate substantive due process); *Kowtoniuk v. Quarles*, 528 F.2d 1161, 1165 (4th Cir.1975) (same).[23]

Another member of this Court has considered the applicability of substantive due process principles to public employment. In *Young v. Walp*, No. 1:CV–95–456 (M.D.Pa. July 19, 1995), the plaintiff, a former captain of the Pennsylvania State Police, asserted, *inter alia*, a substantive due process claim relating to the termination of his employment. The plaintiff argued that Pennsylvania law protected him from discharge except by way of a court martial. The plaintiff contended that the defendants arbitrarily forced him to resign his position in violation of state law. Judge William W. Caldwell determined that plaintiff "had a property right in his employment for the purposes of procedural due process." *Id.* at 6. After considering *Harrah, Ewing, McKinney, Sutton* and relevant Third Circuit precedent, Judge Caldwell concluded: "[T]o invoke substantive due process, a plaintiff must assert a right protected by the federal constitution. Since public employment

is not such a right, the plaintiff's claim must fail. It is irrelevant that the plaintiff can establish a state-created property right for procedural due process purposes." *Id.*[24] In reaching this result, Judge Caldwell persuasively distinguished Fifth and Eighth Circuit precedents that have found public employment to be protected by substantive due process. *See, e.g., Moulton v. City of Beaumont*, 991 F.2d 227, 232 (5th Cir.1993); *Moore v. Warwick, supra.*

After considering the relevant case law, it is apparent that any attempt to define the parameters of substantive due process is wrought with difficulty. I am persuaded, however, by the approach advocated by Judge Alito and set forth in *McKinney.* Significantly, subsequent case law has adopted, or at least not rejected, *McKinney's* analysis. As with my colleague Judge Caldwell, I predict that the Third Circuit will find that public employment is not a "fundamental" property interest that implicates substantive due process where an individual, non-legislative employment decision is at issue. It cannot be reasonably maintained that public employment is a property interest that is deeply rooted in the Nation's history and traditions. Nor does public employment approach the interests " 'implicit in the concept of ordered liberty' like personal choice in matters of marriage and family." 958 F.2d 1339, 1351. Support for this conclusion is also found in *Bishop v. Wood*, 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976), in which the Court said:

by the Seventh Circuit, 'is no greater than the right to procedural due process.' ") (quoting *Jeffries v. Turkey Run Consolidated Sch. Dist.*, 492 F.2d 1, 4 (7th Cir.1974)).

**24.** Judge Caldwell recently reaffirmed his holding in *Young. See Poteat v. Harrisburg Sch. Dist.*, 33 F.Supp.2d 384, 393 n. 3 (M.D.Pa.1999) ("The Plaintiff also made a claim for substantive due process but, in our view, he has no substantive due process right to his job.").

**23.** Other courts have taken a more pragmatic approach, suggesting that substantive and procedural due process rights are coextensive. *See, e.g., Schaper v. City of Huntsville*, 813 F.2d 709, 717 (5th Cir.1987) ("[Plaintiff's] substantive due process claim, although advanced under a different rubric, really raises the same claim rejected [under the procedural due process analysis]."); *Buhr v. Buffalo Pub. Sch. Dist. No. 38*, 509 F.2d 1196, 1202 (8th Cir.1974) ("In other words, to the extent our cases recognize a constitutional right to substantive due process, that right, as expressed

The federal court is not the appropriate forum in which to review the multitude of personnel decisions that are made daily by public agencies. We must accept the harsh fact that numerous individual mistakes are inevitable in the day-to-day administration of our affairs. The United States Constitution cannot feasibly be construed to require federal judicial review for every such error. In the absence of any claim that the public employer was motivated by a desire to curtail or to penalize the exercise of an employee's constitutionally protected rights, we must presume that official action was regular and, if erroneous, can best be corrected in other ways. The Due Process Clause of the Fourteenth Amendment is not a guarantee against incorrect or ill-advised personnel decisions.

*Id.* at 359–60, 96 S.Ct. 2074.

█ Moreover, this conclusion is consistent with Third Circuit precedent. *DeBlasio* involved a fundamental property interest dating to the foundation of the American colonies, *i.e.*, real property ownership.[25] On the other hand, the interest in public employment is more closely analogous to those interests that the Third Circuit has determined fail to rise to the level of a fundamental property interest protected by substantive due process.[26]

The interest in public employment is akin to the contractual right to payment for services provided to the state that was deemed insufficient to implicate due process concerns. *Reich,* 883 F.2d at 243–44. Moreover, the interest in public employment is also analogous to a state's arbitrary refusal to award construction work to the low bidder. *Independent Enters.,* 103 F.3d at 1180 (holding that water and sewer authority's denial of an award of contract to construction company with low bid did not implicate the type of "fundamental" interest entitled to protection of substantive due process). Further, the interest in public employment can also be compared to a state law entitlement to water services. *Ransom,* 848 F.2d at 411–12 (finding that state law entitlement to water services fails to implicate rights protected by substantive due process). The Third Circuit determined that all of these interests, which involve the receipt of payment, work or services from the state, were insufficient to implicate substantive due process. Any property right in public employment more closely resembles these interests than the "fundamental" interest of real property ownership recognized in *DeBlasio.* In short, Homar has failed to present a "fundamental" property interest and his substantive due process claim must be dismissed.[27]

25. *DeBlasio* is also distinguishable because the land-use decision at issue in that case resembled legislative action as opposed to a personnel decision.

26. As noted in *McKinney*, recognition of a substantive due process interest in the context of an individual personnel decision would encourage disgruntled employees to eschew state administrative and legal remedies. 20 F.3d at 1560. Indeed, in this case, Homar apparently elected to forego contractually guaranteed arbitration and instead proceeded in federal court.

27. Consideration of the viability of Homar's substantive due process claim may be academic, at least insofar as Homar seeks damages. Defendants have raised the defense of qualified immunity. (Def's Answer (Dkt. Entry 15) ¶ 43.) "[G]overnment officials per-

forming discretionary functions generally are granted a qualified immunity and are 'shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Wilson v. Layne,* —— U.S. ——, ——, 119 S.Ct. 1692, 1696, 143 L.Ed.2d 818 (1999). As the above analysis has demonstrated, public employment does not clearly warrant substantive due process protection. *See Homar,* 89 F.3d at 1021 ("[T]he case law of this circuit and the Supreme Court provides very little guidance as to what constitutes this 'certain quality' of property interest worthy of protection under the substantive due process clause."); *see also Lum,* 876 F.2d at 1389 ("Thus, we conclude that there was no clearly established constitutional right to substantive due process protection of continued public employment."); *Coover,* 955

## III. CONCLUSION

For the reasons set forth herein, Homar's claim of a procedural due process violation for failure to provide a prompt post-suspension hearing will be dismissed. Because Homar has failed to allege a "fundamental" property interest, his substantive due process claim will also be dismissed. An appropriate Order is attached.

### ORDER

NOW, THIS ___ DAY OF SEPTEMBER, 1999, for the reasons set forth in the foregoing Memorandum, **IT IS HEREBY ORDERED THAT:**

1. Plaintiff's procedural due process claim with respect to the timeliness of the opportunity to be heard after he was suspended from his position as a campus police officer is **DISMISSED.**

2. Plaintiff's substantive due process claims with respect both to his suspension and later demotion to groundskeeper is **DISMISSED.**

3. A scheduling conference shall be held on **Monday, September 27, 1999 at 9:00 a.m.** If the parties wish to conduct this conference by telephone, they must inform the Court in writing **three (3)** days prior to the conference.

F.Supp. at 402 (noting that Third Circuit had not determined whether a public employee protected by substantive due process); *Lei,* 1997 WL 634506, at *8 ("As such, we conclude that [plaintiff] has not asserted a valid substantive due process claim [for termination of public employment]. Even if he did, the right was certainly not clearly established."); *Hassel,* 1997 WL 269575, at *4 ("It is disputable whether continued public employment implicates substantive due process concerns."); Ronald J. Krotoszynski, Jr., "Fundamental Property Rights," 85 Geo.L.J. 555, 578 (1997) ("Accordingly, in the aftermath of *DeBlasio* it is difficult to state the law of the Third Circuit regarding the status of substantive due process property claims."). Therefore, defendants are entitled to qualified immunity in relation to Homar's substantive ·due process claim.